

**EOD**

06/04/2007

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **MEGA SYSTEMS, L.L.C.** | § | Case No. 03-60190 |
| Tax ID: xx-xxx2414 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| BOB ANDERSON, | § | |
| Chapter 7 Trustee | § | |
| | § | |
| Plaintiff | § | |
| v. | § | Adversary No. 04-6085 |
| | § | |
| MEGA LIFT SYSTEMS, L.L.C. | § | |
| and JAMES LEE BARTLEY | § | |
| | § | |
| Defendants | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Now before the Court for consideration is the "Complaint for the Return of Fraudulently Transferred Assets and Injunction Against Disposition of Transferred Assets" filed in the above-referenced adversary proceeding. By his complaint, Bob Anderson (the "Trustee"), the Trustee for the Chapter 7 Bankruptcy Estate of Mega Systems, L.L.C., seeks to avoid the Debtor's transfer of essentially all of its operating assets to Mega Lift Systems, L.L.C. ("Mega Lift") under various theories arising under

---

[1]These findings of fact and conclusions of law are not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

both the Bankruptcy Code and Texas state law.[2]  Additionally, the Trustee seeks an award

of punitive damages against Mega Lift and its co-defendant, James Lee Bartley

("Bartley"), who owned and controlled both the Debtor-transferor and the transferee,

Mega Lift.  Finally, the Trustee seeks the imposition of an injunction to prevent Bartley

and Mega Lift from again transferring the assets in question.  A trial was held on

February 20, 2007, after which the Court solicited the filing of post-trial briefs on

designated topics.  Upon receipt of the post-trial briefs, the Court took the matter under

advisement.  These findings of fact and conclusions of law dispose of all issues pending

before the Court.

### Findings of Fact

1.  The Debtor, Mega Systems, L.L.C.,[3] was a Texas limited liability company located

    in Tyler, Texas.[4]

2.  Defendant, Mega Lift Systems, L.L.C., is a Texas limited liability company located

    in Tyler, Texas, created in early 2002.

---

[2]  The theories asserted by the Trustee as grounds for setting aside the transfers are: fraudulent transfer under both §548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code; fraudulent transfer under Chapter 24 of the Tex. Business and Commerce Code, incorporating 11 U.S.C. §§542 and 544; breach of fiduciary duty; and fraud.

[3]  For ease of reference in distinguishing it from the transferee-defendant, Mega Lift Systems, L.L.C., the transferor-debtor, Mega Systems, L.L.C., will be referenced throughout these findings and conclusions as "the Debtor," regardless of whether any particular reference to Mega Systems, L.L.C. in any finding or conclusion occurred before or after the actual filing date of its bankruptcy case.

[4]  With the exception of certain grammatical changes, findings of fact ## 1-6 herein are taken from Agreed Issues of Fact ## 1-6 as stipulated by the parties in the *Pre-Trial Order* approved in this adversary proceeding on February 7, 2007 (dkt #59).

3.     At all times relevant to this matter, Bartley was the president and majority and controlling shareholder, as well as an insider, of the Debtor.

4.     Bartley is or was also at all times relevant to this matter the principal officer and majority and controlling shareholder of Mega Lift Systems.

5.     Mega Lift Systems is an affiliate of the Debtor.

6.     On December 13, 2001, in Case No. 6:99CV437, the United States District Court of the Eastern District of Texas (the "District Court") entered an Order Adopting Special Master's Findings of Fact and Conclusions of Law (the "Adoption Order"), stating that Ferguson Beauregard/Logic Controls ("Ferguson Beauregard") was entitled to a judgment against the Debtor in the amount of $416,826.00, plus interest.

7.     The Adoption Order entered by the District Court gave Ferguson Beauregard until January 14, 2002 to draft the final judgment and injunction in that case.

8.     On or about December 28, 2001, Bartley met with and retained attorney Michael J. McNally on behalf of the Debtor.[5]

9.     McNally's December 28, 2001 engagement letter states: "you advised me of your intention, in your individual capacity, to form one or more new corporate entities which will be engaged in substantially the same business as Mega."[6]

---

[5]  Agreed Issue of Fact #32.

[6]  Agreed Issue of Fact #33.

10.     McNally cautioned Bartley and the other officers of the Debtor that the transfer of

         any assets, including intellectual property assets and goodwill, must be at fair

         market value.[7]

11.     On February 1, 2002, Bartley caused assets of the Debtor to be transferred to Mega

         Lift Systems.[8]

12.     On February 6, 2002, the District Court entered a final judgment in favor of

         Ferguson Beauregard and against Debtor in the amount of $416,826.00

         (the "District Court Judgment").

13.     The Debtor had annual sales in excess of $1 million at the time of the transfer of

         its assets.

14.     In exchange for the assets, Mega Lift Systems paid to the Debtor approximately

         $14,500.00 in cash, assumed $50,000.00 in debt, and issued a promissory note to

         the Debtor for approximately $119,383.00 (inclusive of interest), payable over

         almost two years.

15.     Mega Lift Systems did not assume the District Court Judgment against Debtor nor

         the other liabilities listed in the Debtor's bankruptcy schedules.

16.     Bartley possessed and exercised sole and final authority to decide which assets

         were transferred to Mega Lift Systems, and which liabilities it would reject in the

---

[7]  Agreed Issue of Fact #34.

[8]  With the exception of certain grammatical changes, findings of fact ## 11-34 herein are taken from Agreed Issues of Fact ## 7-30 as stipulated by the parties in the *Pre-Trial Order*.

transfer.

17.     The transfer between the Debtor and Mega Lift Systems was not an arms-length transaction.

18.     Bartley personally prepared all the bills of sale and promissory notes for the transfer and signed the bills of sale for the transfer on behalf of both parties to the transaction.

19.     Bartley sought no independent valuation of the Debtor or of the Debtor's business. He sought only one valuation of the equipment.  He personally prepared the valuation for raw materials inventory.

20.     Bartley sought no independent buyers for the Debtor, nor did he advertise the sale of the Debtor.

21.     The shareholders and management of the Debtor and Mega Lift Systems are the same.

22.     Both the Debtor and Mega Lift Systems share common ownership and management.  Bartley is the president and majority owner, and Paula Bartley and Donald Bartley were officers and minority owners of both companies at the time of the transfer.

23.     Mega Lift Systems was in the identical business as the Debtor.

24.     After the transfer, Mega Lift Systems began to provide the same services as the Debtor had provided prior to the transfer, and to sell the same products as the

Debtor had previously sold, including the Debtor's proprietary products, such as the oil and gas well controllers denominated as "APC 500" and "APC 1000."

25.   The Debtor's employees became employed by Mega Lift Systems.

26.   Mega Lift Systems began to serve the same clientele as the Debtor had served.  It used the same patents, the same equipment, computers, trade secrets, know-how, software design, proprietary names, and proprietary information as the Debtor had.

27.   The Debtor was unable to produce its product lines after the transfer at issue.

28.   After the transfer, the Debtor was unable to generate any new accounts receivable.

29.   Bartley, as president and majority shareholder of the Debtor, knew that the Debtor was insolvent or, in the alternative, near insolvency at least as early as December 2001, and on February 1, 2002, the date of the transfer.

30.   The transfer occurred as a result of the entry of the Adoption Order by the District Court which indicated an intent to award damages to Ferguson Beauregard prior to the formal entry of judgment.

31.   Bartley formed Mega Lift Systems and sold the Debtor's assets to Mega Lift Systems because the Debtor owed a significant amount of money to its creditors.

32.   Bartley, individually and as an officer and shareholder, did not notify any of the Debtor's creditors of the transfer of the Debtor's assets to Mega Lift Systems.

33.   Neither Bartley nor the Debtor approached Ferguson Beauregard about the possibility of Ferguson Beauregard purchasing the Debtor.

34.   The transfer constituted the Debtor's divestiture of all its operating assets.

35.   The transfer effectively eliminated the Debtor's ability to produce its product line or to effectively engage in operations.

36.   Prior to the transfer of assets, Bartley made no effort to determine the availability of financing to address the Debtor's indebtedness, nor did he seek an independent valuation of the Debtor's business as a going concern.

37.   On January 27, 2003, less than one year after the February 1, 2002 transfer at issue, the Debtor filed its voluntary petition for relief under Chapter 11 in this Court under case no. 03-60190.[9]

38.   Bartley's choice to transfer the assets to another company under his ownership and control could only withstand legal scrutiny if Mega Lift paid a reasonably equivalent value for all the assets it received from the Debtor.

39.   At the time of the transfer, Mega Lift paid consideration worth $173,039.36 in exchange for essentially all the operating assets of the Debtor.[10]

40.   Components of the consideration paid by Mega Lift to the Debtor were as follows:

   (1) the payment of $12,959.36 cash and assumed indebtedness of $50,000.00 in exchange for the Debtor's equipment;

   (2) the payment of $1,550.00 in cash in exchange for the Debtor's intellectual property; and

   (3) the issuance of a promissory note to the Debtor for $108,530.00 (plus 10%

---

[9]  Agreed Issue of Fact #31.

[10]  Plaintiff's Ex. 1-4.

simple interest) in exchange for the Debtor's inventory.[11]

41. Bartley, either in his individual capacity or through creation of a new entity such as Mega Lift, could have paid a reasonably equivalent value for the assets of the Debtor by engaging in a competitive sales process for the Debtor prior to the filing of the Debtor's bankruptcy case or by buying the assets in a bankruptcy sales process conducted by the bankruptcy trustee after the filing of the Debtor's bankruptcy case.

42. The utilization of either sales process would have given interested parties notice and would have properly tested the propriety of the price received for the sale of the Debtor's assets. Bartley elected to do neither.

43. Bartley sought no independent buyers for the Debtor, nor did he advertise the sale of the Debtor to any outside parties.

44. Bartley effectively retained control of all assets transferred from the Debtor to Mega Lift.

45. For the purpose of the transfer to Mega Lift, Bartley appraised a patent owned by the Debtor at an approximate value of $1,550.00, though the Debtor had purchased that patent in 1999 for $20,000.00.

46. In calculating the fair market value of the Debtor's inventory in a liquidation, Bartley valued the inventory at cost — a generous standard which resulted in a

---

[11] *See* Plaintiff's Ex. 3 and Defendants' Ex. 4.

-8-

higher than expected financial yield to the Debtor for its inventory assets.

47.   Mega Lift received a particular configuration of assets-in-place from the Debtor, thereby retaining the essential intangible advantages accrued by the Debtor's business, and therefore, Mega Lift should have paid the Debtor for the value of the configuration of the assets-in-place, or in other words, for the goodwill received.

48.   Goodwill was an intangible capital asset of the Debtor for which Mega Lift should have paid a reasonably equivalent value.

49.   A potential buyer would have compensated the Debtor for the value of that goodwill, though the risk of competition from Bartley in the post-transfer period would have decreased the amount of that compensation.

50.   That compensation would have decreased since a portion of the intangible value reflected in the Debtor's goodwill was directly dependent upon the skills supplied by Bartley as the Debtor's key employee.

51.   Bartley's participation was not necessary to allow a potential buyer to realize a portion of the intangible value of the Debtor's assets-in-place.

52.   Bartley's conclusion that no such potential buyer existed is unsupported and unreliable because he did nothing to seek such a buyer.

53.   The reasonably equivalent value of the Debtor's assets, as configured immediately before the February 1, 2002 transfer, was greater than the total value of the individual assets transferred.

54.    The proper method for valuing the Debtor's assets in this case would have been to

calculate a present value for the income stream generated by the configured assets,

then to discount that value for the lack of marketability and the absence of a non-

competition agreement from Bartley as its manager and primary employee. *See,*

*e.g., In re Prince*, 85 F.3d 314, 318-20 (7th Cir. 1996).

55.    The value of the Debtor's assets, as calculated by the discounted stream of cash

flows, is required to be reduced by a significant factor – 30% – which would

account for the fact that any buyer of the Debtor's assets would face the risk of

direct competition from Bartley in that same business subsequent to the transfer of

the Debtor's assets. *Id.* at 321.

56.    This Court is not bound by precise values tendered by appraisal experts as to what

constitutes the payment of reasonably equivalent value in this case and the Court

has reviewed all of the evidence in an effort to form its own opinion in that regard.

*See generally, Holcomb Health Care Servs. v. Quart Ltd., L.L.C. (In re Holcomb*

*Health Care Servs., L.L.C.),* 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004).

57.    The expert evidence submitted to the Court on the valuation of the Debtor's assets

varied widely; however, because Mega Lift essentially continued to operate the

Debtor's business, the income stream valuation upon which the testimony of

Robert Bailes, the Trustee's expert, was based, though not inerrant, was more

credible than the straight liquidation analysis offered by Tony Morgan, the

Defendants' expert. *Prince*, 85 F.3d at 319-20.

58. Finding the base valuation figure proffered by the Trustee's expert ($911,642.00) to be credible, and was his initial discount of 25% from that base figure for lack of marketability (.25 × $911,642.00 = $227,910.50), and with that sub-total further discounted by a 30% factor for the lack of a non-competition agreement from Bartley (.3 × $911,642.00 = $273,492.60), the value of the Debtor's assets as configured at the time they were transferred to Mega Lift, was $410,238.90.

59. The facial impropriety of the transfer of the Debtor's assets by Bartley in a non-competitive environment to a new company controlled by him could only be overcome by the payment of consideration to the Debtor in an amount sufficient to satisfy the strictest scrutiny.

60. Bartley structured the transaction in the manner that he did because he believed that the particular configuration of Debtor's assets had value which could be extracted for his benefit from the Debtor through a transfer of its assets to a new entity which would not be liable for the judgment to Ferguson Beauregard.

61. Bartley intended to hinder, delay, or defraud the Debtor's creditors for his personal benefit by extracting the value of the Debtor's intangible assets as then-configured before the Debtor's creditors could realize such value through purchase, foreclosure, or some other legal means.

62. Bartley usurped the Debtor's opportunity to obtain an accurate valuation of its

assets by refusing to offer to sell the assets-in-place as then configured as a going

concern to any other entity, and by refusing to give other entities, including the

Debtor's creditors, the opportunity to engage in competitive bidding for the

Debtor's assets.

63.   Bartley intentionally rejected the use of any process by which an accurate

valuation of the Debtor's assets could be determined.

64.   Bartley calculated a suppressed amount which Mega Lift would pay for the assets

of the Debtor to create the illusion that a reasonably equivalent value had been

paid for the Debtor's assets.

65.   Mega Lift failed to provide, and the Debtor received less than, a reasonably

equivalent value in exchange for the assets transferred by the Debtor to Mega Lift.

66.   Mega Lift would have been required to pay an additional $237,199.54 in order to

insure that the Debtor received a reasonably equivalent value for its transfer of

assets to Mega Lift.

67.   In the transfer of assets from the Debtor to Mega Lift for less than a reasonably

equivalent value, both Bartley and Mega Lift intended to hinder, delay, or defraud

creditors of the Debtor.

68.   The Trustee failed to sustain his burden of proof regarding allegations of fraud[12] or

---

[12]   The Court notes that, in addition to the lack of sufficient evidence on the issue of damages, there is no evidence that Ferguson Beauregard or any other entity reasonably relied on Bartley's silence. Reasonable reliance is a necessary element of a cause of action for fraud. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 302, 322 (5th Cir. 2002).

breach of fiduciary duty[13] against the Defendants because there is insufficient

evidence of any actual damages arising from any fraud or breach of fiduciary duty

by the Defendants distinct from the failure to transfer a reasonably equivalent

value to the Debtor as alleged under the cause of action for a fraudulent transfer.

69. The Trustee failed to sustain his burden of proof regarding his entitlement to, or

the reasonableness of, any attorney's fees incurred in attempting to recover the

fraudulent transfers.

70. For the purpose of entitlement to a recovery of exemplary damages under Texas

law, the Trustee failed to sustain his burden of proof as to any fraudulent intent of

the Defendants by clear and convincing evidence, given the existence of some

evidence that Bartley merely failed in a legitimate attempt to pay a reasonably

equivalent value for the assets transferred to Mega Lift by the Debtor.

71. The record fails to contain any evidence of any demand being made on the

Defendants before the complaint in this action was filed on August 19, 2004.

72. The current rate of both pre- and post-judgment interest under Texas law as of the

date of the judgment in this case is 8.25%.

---

[13] While the Court acknowledges the Trustee's arguments regarding fiduciary duties which arise in favor of creditors when a debtor approaches a "zone of insolvency," the Court also notes the cogent analysis and rejection of this theory of recovery under Texas law set forth by the Hon. Melinda Harmon in *Floyd v. Hefner*, 2006 WL 2844245, at *10 (S.D. Tex. Sept. 29, 2006).  Furthermore, even if the Court were to accept the proposition that a director of a corporation approaching insolvency owes fiduciary duties to the corporation's creditors, it is difficult to see how a defendant in on-going litigation would owe fiduciary duties to the plaintiffs in such litigation such that he would be obligated to disclose all asset movement at the defendant corporation when the parties are situated in such an adversarial posture.

73.     Among other relief, the Trustee's complaint seeks:

> Temporary, preliminary, and permanent injunctive relief ...
> barring Defendant Mega Lift Systems LLC, [and] Defendant
> Bartley... from transferring, encumbering, apothecating [sic],
> liening, suffering to be liened, pledging, dissipating, or
> otherwise alienating assets, rights, or chooses in action of any
> type or nature whatsoever, pending resolution of this suit...[14]

74.     To the extent any of the above findings of fact is construed to be a conclusion of

law, it is expressly adopted as such by this Court.

## Conclusions of Law

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and

157(b)(2)(E) and (H), and 11 U.S.C. §§548 and 550.  This Court may exercise

personal jurisdiction over the parties to this adversary proceeding.  This is a core

proceeding.

2.      A party which seeks to avoid a transfer under §548 bears the burden of proof on all

of the required elements, including the debtor's insolvency and the absence of

reasonably equivalent value.  See e.g. *In re Empire Interiors*, 248 B.R. 305, 307

(N.D. Ohio 2000);  *In re Emerald Hills Country Club, Inc.*, 32 B.R. 408 (S.D. Fla.

1983).

---

[14]  *See* ¶ E of the prayer of the Plaintiff's Complaint at p. 22.

3.     To avoid an allegedly fraudulent transfer under 11 U.S.C. §548(a)(1)(A), the

Trustee must prove three elements: (1) a transfer of an interest in debtor's property

occurred; (2) such transfer was made with actual intent to hinder, delay, or defraud

any entity to which the debtor was indebted at the time; and (3) the transfer

occurred within one year of the date of the filing of the bankruptcy petition.

*Chiasson v. Cardon (In re Accurate Home Inspectors, Inc.)*, 348 B.R. 354, 357-58

(Bankr. E.D. La. 2005).

4.     Because actual intent is subject to probative limitations (one would nearly always

expect a debtor to testify that he did not intend to hinder, delay, or defraud

creditors), courts look to the badges of fraud to assist in the credibility

determination inherent in determining the intent of a party.  *Pavy v. Chastant (In re*

*Chastant)*, 873 F.2d 89 (5th Cir. 1989); *FDIC v. Sullivan (In re Sullivan)*, 204 B.R.

919, 940 (Bankr. N.D. Tex. 1995); *Cullen Center Bank & Trust v. Lightfoot (In re*

*Lightfoot)*, 152 B.R. 141, 148 (Bankr. S.D. Tex. 1993).

5.     The Fifth Circuit has noted that the following badges of fraud can assist in

determining the intent of a debtor:

> (1) the lack or inadequacy of consideration; (2) the family,
> friendship, or close personal relationship between the parties;
> (3) the retention of possession, benefit, or use of the property
> in question; (4) the financial condition of the party sought to
> be charged, both before and after the transaction in question;
> (5) the existence or cumulative effect of the pattern or series

-15-

of transactions or course of conduct after the incurring of
debt, onset of financial difficulties, or pendency or threat of
suits by creditors; and (6) the general chronology of the
events and transactions under inquiry.
*Chastant*, 873 F.2d at 91.

6.     The presence of essentially all of the above-mentioned badges of fraud in the

Mega Lift transfer creates a strong inference of an intent by the Defendants to

hinder, delay, or defraud the Debtor's creditors.

7.     The transfer from the Debtor to Mega Lift Systems is avoidable under 11 U.S.C.

§548(a)(1)(A).

8.     To establish the existence of a constructive fraudulent transfer under 11 U.S.C.

§548(a)(1)(B), a plaintiff must show:

> (1) the debtor transferred an interest in property; (2) the
> transfer of that interest occurred within one year prior to the
> filing of the bankruptcy petition; (3) the debtor was insolvent
> on the date of the transfer or became insolvent as a result
> thereof; and (4) the debtor received less than reasonably
> equivalent value in exchange for such transfer. *In re GWI
> PCS 1 Inc.,* 230 F.3d 788, 805  (5th Cir. 2000) (*citing In re
> McConnell*, 934 F.2d 662, 664 (5th Cir. 1991)).

9.     To determine whether the Debtor received reasonably equivalent value in

exchange for the transfer of substantially all of its assets, the Court must compare

the value that accrued to the Debtor to the value of the assets which the Debtor

**-16-**

transferred.  *In re Fairchild Aircraft*, 6 F.3d 1119 (5th Cir. 1993); *Mancuso v. T. Ishida USA, Inc. (In re Sullivan)*, 161 B.R. 776 (Bankr. N.D. Tex. 1993).

10.     There need not be a dollar-for-dollar exchange for the transfer to be legitimate, but the Court must consider the net effect on the total assets of the debtor available to meet the demands of creditors.  *Id.* at 781.

11.     When, due to a particular configuration of assets-in-place, including intangible elements such as a trained workforce, an operating facility, and necessary licenses, systems and procedures, a business entity possesses the capacity to generate a stream of income in the future that, even when discounted, is worth more than the aggregate value of the tangible assets, that business entity should be valued as a going concern.

12.     The difference between the aggregate value of the Debtor's assets at a liquidation, and the value of the Debtor's assets-in-place as then configured, constitutes a component of the goodwill of the Debtor.

13.     "Good-will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or

necessities, or even from ancient partialities or prejudices." *Rice v. Angell*, 73 Tex. 350, 353, 11 S.W. 338, 339 (1889), cited with approval in *Salinas v. Rafati*, 948 S.W.2d 286 (Tex. 1997).

14.     Goodwill is property and may be sold just like any other property. *Tex. & P. Ry. Co. v. Mercer*, 127 Tex. 220, 90 S.W.2d 557, 560 (1936). Although intangible, goodwill is an integral part of a business, the same as the physical assets, and can be transferred apart from any tangible assets. *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 933 (Tex. App. – Houston [1st Dist.] 1993, no writ).

15.     Texas law further recognizes that the goodwill may exist in a trade or business independent of any goodwill specifically engendered by the skill or ability of any particular person or member. *Id*. at 290-91; *Nail v. Nail*, 486 S.W.2d 761, 763-64 (Tex. 1972).

16.     With regard to expert appraisals, it has been long recognized that "[v]aluation outside the actual market place is inherently inexact." *Rushton v. Comm'r*, 498 F.2d 88, 95 (5th Cir. 1974). *See also Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 242 (6th Cir.), *cert. denied*, 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939) ["The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either."]; *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 337 (Bankr. S.D. Ohio 1992) ["Valuations of

... property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted"].

17.     Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *In re Coates*, 180 B.R. 110, 112 (Bankr. D.S.C. 1995) ["The valuation process is not an exact science and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of . . . [the appraisal] evidence."].

18.     In weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. *In re Smith*, 267 B.R. 568, 572-73 (Bankr. S.D. Ohio 2001).

19.     The transfer from the Debtor to Mega Lift Systems is avoidable under 11 U.S.C. §548(a)(1)(B).

20.     Under 11 U.S.C. §544(b), a transfer may also be set aside in accordance with state law. *Joe T. Dehmer Distributors, Inc. v. Murry Owen Temple*, 826 F.2d 1463,

-19-

1466 (5th Cir. 1987).

21.   Section 544 allows the trustee to step into the shoes of a creditor for the purpose of

asserting causes of action under state fraudulent conveyance laws and confers on

the trustee the status of a hypothetical creditor or bona fide purchaser as of the

commencement of the case.  *Sherman v. FSC Realty LLC (In re Brentwood-*

*Lexford Partners*), 292 B.R. 255, 262 (citing *In re Zedda*, 103 F.3d 1195, 1201,

(5th Cir. 1997)).

22.   Texas state law provides for recovery of a fraudulent transfer on a showing

substantially similar to that required by the Bankruptcy Code.  *Id*. at 262-63; *see*

TEX. BUS. & COMM. CODE ANN.  §24.001 *et seq.* (Vernon 2002).

23.   Texas state law provides for the avoidance of transfers which are either actually or

constructively fraudulent.  TEX. BUS. & COMM. CODE ANN. §§24.005 and 24.006

(Vernon 2002).

24.   The transfer from the Debtor to Mega Lift Systems is avoidable under TEX. BUS. &

COMM. CODE §24.005(a)(1).

25.   The transfer from the Debtor to Mega Lift Systems is avoidable under TEX. BUS. &

COMM. CODE §24.006(a).

26.   11 U.S.C. §550 provides as follows:

(a) Except as otherwise provided in this section, to the extent

that a transfer is avoided under section 544, 545, 547, 548,

549, 553(b), or 724(a) of this title, the trustee may recover, for

**-20-**

the benefit of the estate, the property transferred, or, if the

court so orders, the value of such property, from–

> (1) the initial transferee of such transfer or the
>
> entity for whose benefit such transfer was made;
>
> or
>
> (2) any immediate or mediate transferee of such
>
> initial transferee.

27.   The trustee may recover the transfer or the value thereof from any immediate or

mediate transferee of the initial transfer unless the immediate or mediate transferee

takes in good faith.  *See* U.S.C. 550(b)(2).

28.   The Bankruptcy Code does not distinguish the circumstances under which the

finding of a fraudulent transfer should give rise to a recovery of the actual assets,

as opposed to the entry of a money judgment for the value of such assets, though

the forms of recovery are mutually exclusive.  Hence, the decision is within the

Court's discretion.  *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R.

165, 176-77 (Bankr. S.D.N.Y. 1998).

29.   "The factors which the Court should consider in determining whether to order

turnover of the property rather than payment of the value include whether the value

of the property (1) is contested; (2) is not readily determinable; or (3) is not

diminished by conversion or depreciation."  *Id.*

30.   Although the value of the transferred assets was vigorously contested in this case,

and is not readily determinable, the value of those assets has been diminished by

the consumption of inventory, the depreciation of equipment, and the passage of time.

31. Thus, the proper remedy in this case is an award for the value of the assets fraudulently transferred, less the amounts actually received by the Debtor in exchange for the assets.

32. Turnover of all the assets of Mega Lift would not be an appropriate remedy in this case.

33. There is insufficient evidence in the record to preclude the possibility, if not the likelihood, that value has been added to Mega Lift from other appropriate sources (such as additional paid-in capital or uncompensated labor) since the time of the fraudulent transfers.

34. There is no specific Bankruptcy Code provision allowing a court to grant exemplary damages against the transferor or transferee of a fraudulent transfer. *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 392 (Bankr. S.D. Tex. 2005).

35. "A bankruptcy court may rely on state law to award exemplary damages where the Code does not specifically allow such measures." *Id.* at 391.

36. Texas law provides for an award of exemplary damages only on a showing of fraud or malice by clear and convincing evidence.  TEX. CIV. PRAC. & REM. CODE ANN. §41.003(a)-(b) (Vernon Supp. 2006).

-22-

37. As stated above, Trustee's showing of fraud is sufficient to meet the evidentiary standard of a preponderance of the evidence, but insufficient to meet the clear and convincing standard necessary to support an award of exemplary damages.[15]

38. A fact-finder is always free to decline to award exemplary damages, as such an award is within the discretion of the fact-finder. TEX. CIV. PRAC. & REM. CODE ANN. §41.010(b) (Vernon Supp. 2006).

39. "Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute." *In re Texas Gen. Petrol. Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995).

40. The Fifth Circuit has held that prejudgment interest is available on a recovery under §548. The Circuit stated:

> Federal courts apply a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act. The Bankruptcy Code and particularly §548 are silent with regard to prejudgment interest... Furthermore, an award of

---

[15]   Even if the Court were to award exemplary damages, the Court would need to weigh six factors in determining the propriety of the award: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. *Amberjack*, 326 B.R. at 393. While the Defendants' acts certainly offend the Court's sense of justice and propriety, the Court has no evidence of the current net worth of any Defendants which would facilitate the necessary determination of the propriety of any awarded amount.

> prejudgment interest furthers the congressional policies of the
> Bankruptcy Code.  The purpose of [Section 548] is to make
> the estate whole. Prejudgment interest compensates the estate
> for the time it was without use of the transferred funds.
> *Id.* at 1339-40 (internal citations omitted).

41.   Federal law also governs the determination of the proper rate of prejudgment

interest, but there is no federal statute setting such a rate.  *Hansen v. Continental*

*Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).

42.   Absent a federal statute on the matter, state law is an appropriate source of

guidance on the proper prejudgment interest rate.  *Dramse v. Delta Family-Care*

*Disability and Survivorship*, 2007 WL 60907, at *2 (N.D. Tex. 2007) (citing

*Hansen*, 940 F.2d at 984).

43.   Texas state law utilizes the same rate for both pre- and post-judgment interest,

generally utilizing the prime rate as published by the Board of Governors of the

Federal Reserve System on the fifteenth day of the month preceding the month of

the judgment.  TEX. FIN. CODE ANN. §§ 304.003 and 304.103 (Vernon 2006).

44.   Although an injunction may be an acceptable remedy for violations of the Texas

Uniform Fraudulent Transfer Act, the Trustee in this case has not requested post-

judgment injunctive relief in his complaint.  TEX. BUS. & COMM. CODE ANN.

§24.008 (Vernon 2002).

45.   Because the Trustee did not pursue any request for preliminary injunctive relief in

-24-

the pre-trial period, and because he has not requested injunctive relief beyond the resolution of this lawsuit, the Court denies the Trustee's request for the imposition of injunctive relief against the Defendants.[16]

46.    To the extent any of the above conclusions of law is construed to be a finding of fact, it is expressly adopted as such by this Court.

### Conclusion

For the foregoing reasons, the Court concludes that the Plaintiff, Bob Anderson, Chapter 7 Trustee, is entitled to a judgment against Defendants, Mega Lift Systems, L.L.C. and James Lee Bartley, jointly and severally, for damages in the amount of $237,199.54, plus pre-judgment interest in the amount of $54,632.25 (accruing from the date of the complaint, August 19, 2004, to June 4, 2007 at a rate of 8.25% simple interest).  Hence, the Plaintiff-Trustee is entitled to a judgment for $291,831.79, upon which post-judgment interest will accrue at the current federal post-judgment interest rate of 4.96%.  The Court will enter an appropriate judgment consistent with these findings and conclusions.

Signed on 06/04/2007

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[16]  This conclusion should not suggest to the Defendants that any subsequent attempt to effectuate a transfer similar to the one arising in this action would not be addressed by appropriate action.